The first case on our docket is Christine Oliviana Widjaja v. William P. Barr. So if your parties are ready to proceed, you may begin. Thank you, Your Honor. Good morning, Your Honors. Adam Fleming on behalf of the petitioner Christine Widjaja. May it please the Court, I would like to reserve two minutes for rebuttal, and I'll mind the clock. Thank you. Your Honors, we believe the issue in this case is relatively straightforward. Whether during the 15-year period from 2001 to 2015 there was a material change in country conditions in Indonesia regarding the treatment of Chinese Christians, we asked the Court to vacate the Board of Immigration Appeals' two-page decision for two reasons. First, we believe that the Board did not meaningfully address much of the petitioner's evidence regarding changed country conditions. And second, we believe that to the extent that the Board did address such evidence, the Board's decision is irrational and not supported by sufficient reasoning. In our brief, we've documented an increasing and extremely prevalent trend regarding abundant changes in the 15-year period from 2001 to 2015. Counsel, can I interrupt you for a moment? I'd like you to address this question, please. Has your client presented sufficient evidence that she herself set aside the country conditions for a moment? Not merely her family members or Christians generally would be persecuted in Indonesia? Your brief did not go into much detail on that point. Yes, Your Honor. We believe she has presented sufficient evidence. As you're aware, the Ninth Circuit's disfavored group analysis allows for a petitioner to submit evidence of personal targeting in conjunction with country conditions evidence. And the greater the evidence of group targeting, the lesser the threshold of individualized targeting. Nonetheless, there still needs to be some. Yes, Your Honor. And she submitted evidence that members of her family, obviously she's been in the country for 30 years at this point, but the targeting of her family members with whom she would reside if she returned to Indonesia we believe is directly relevant, especially in light of the fact that one of her immediate, well, I don't know if the term immediate relatives would be appropriate, but her brother was directly threatened by supporters of the Islamic State. And she's documented other attacks on numerous members of her family, which would be... If I could, let me ask you to address what I think is the bone of contention here. Our case, our opinion in Saleem came down after the BAA decision in this case, correct? Yes, Your Honor. The government says Saleem isn't controlling. So since they're going to say that, I'd like to hear what your argument about why you think Saleem controls in this case or at least requires that we send it back to the BAA to address the importance of Saleem. Yes, Your Honor. One thing I would like to note is that some of these issues regarding individualized targeting would be more relevant if the Board had denied based on a lack of prima facie showing of eligibility. They could reopen and still turn you down. Theoretically, yes, Your Honor, but that was not the basis of the decision. The basis of the decision was no changed country conditions, which I believe is erroneous under any standard, given that it's a 15-year period of deteriorating conditions. Well, see, I think in the absence of our decision in Saleem, you might have a hard argument. But we have a decision that says country conditions changed based on, for Indonesian Christians, based on roughly the same evidence. The government seems to think it's not exactly on point or distinguishable. So address that for me, please. Yes, Your Honor. Well, I would say our case is actually stronger than Saleem in that we're covering a greater period of changes. In the brief, we do address the similarities between the declaration submitted by Saleem and the declaration submitted in our case. And again, it was a lot of targeting of family members, which was deemed to be relevant towards the issue of individualized targeting. So I do believe that this case falls within the ambit of Saleem, if not stronger than Saleem, given that our case is a longer period of time for the changed country conditions. I recognize that it's not precedential, but we have a subsequent memdisc called Lee v. Sessions. Would you address that one? Yes, Your Honor. I believe it's distinguishable for three reasons, or two reasons, and then I would also note that it is unpublished, as you said. I already noted that, didn't I? Yes. One is that it's covering a shorter period of time, 2003 to 2011. The other reason, I can't say whether or not it is distinguishable, but each motion to reopen would be decided on the individual facts. So to decide whether or not this case would be governed by Lee, you would have to really look at the different records and a different level of individual targeting to decide whether or not that threshold for just a prima facie case has been met. I don't know exactly all of the evidence that was submitted in that case, so I can't say whether or not I believe the petitioner in that case should have prevailed, given the changed country conditions. But given that you're dealing with a shorter period of time, which in that case was cut off at 2011, the four years after that are significant in terms of raising the level of group targeting. So I do believe our petitioner would have a lower threshold of individualized targeting. Again, I don't want to speculate as to whether or not the petitioner in Lee did or did not submit sufficient evidence of individualized targeting. I'm also interested in what it is you want us to do. We would like you to vacate the board's decision and remand to the agency. For further consideration in light of Saleem? Ideally, we would like you to vacate finding that the grounds— I don't think we can find that they must reopen. All we can do is tell them to reconsider their decision not to reopen. We can grant the petition and tell them to look at the case again in light of subsequent authority. I would agree with that. But I don't think we can order them to reopen, can we? No, I would agree with that, Your Honor. But I think the grounds for the denial of changed country conditions I think is squarely before the court, and I do believe that should be vacated. And if that's vacated, the current board decision does not provide an alternative basis for continuing to deny the motion. It's certainly possible the board could look at it again and say, we don't think there's a prima facie case, or they could come up with some other reason, I suppose. But what we're addressing today is the grounds that the board did deny on, which is the lack of changed country conditions. And what's the strongest changes in country conditions that you think are the best or the most obvious? Some of them are cited in the board decision, ironically. I think the presence of Islamic State supporters in Indonesia, I think anybody would consider that a material change. I think the application of Sharia law in parts of Indonesia would be a significant change. The trends in terms of statistics of people that support radical forms of Islam as opposed to more moderate forms of Islam, I think those would be material. Some of the incidents of terrorism that were discussed in the brief, these are all the things, but those would be the most important, and we've labeled more of them in the brief, Your Honor. Do you want to reserve your time? Yes, Your Honor, if there's no further questions. Good morning, Your Honors, and may it please the Court. My name is Brendan Moore, and I represent the respondent, the Attorney General of the United States. The petition for review should be denied here because the board did not abuse its discretion in denying petitioners motion to reopen, which was both time and number bar. This is the second time the petitioner has filed a motion to reopen with the board. Can you cut to the chase and talk about Salim, please?  Do you have a specific question, Your Honor? Tell me what that case does to your case, if anything. Why doesn't Salim control here? It seems like the facts are nearly identical, and in that case, they found that there was a sufficient change in country conditions to merit reopening. So, as you know, the regulation controlling here details that what we're looking at, what the board must look at, is a change in circumstances in the country of nationality, and that involves a comparative analysis between two points in time. But didn't Salim do exactly that analysis over roughly the same time period that we're talking about in this case and conclude that the board had erred in finding that country conditions hadn't changed? So, that panel may have been wrong, but we don't get to revisit that. So, why is your case different? So, it's the first part of what you said, Your Honor, that roughly the same period of time. I would respectfully disagree. The times there, I think... What was the time period in Salim? It was 2006 to 2013, and here we're looking at 2001 to 2015. So, they found that between 6 and 13, country conditions had changed. That period falls within the period that this petitioner is talking about, and I don't see any evidence of improvement in country conditions between 13 and 15. So, I ask again, why doesn't it control? Because, again, Your Honor, we're looking at two points in time. So, the beginning point in time, I think, is what's being overlooked here. So, does the government contend that the situation improved in Indonesia between 2001 and 2003? Well, all we have, of course, really is what the petitioner submitted to the record. But what the board noted, the language actually tracks if you're looking at 2001, 2015. In 2015, in the motion to reopen, the board talked about isolated incidents of violent targeting of Christian churches. And in 2003, in that decision there, it talks about a rise in violence against Christians in some parts of Indonesia during the period of time immediately preceding the hearing. I'm not sure I understand. Are you saying that the conditions improved between 2013 and 2015? It's more, well, in particular, the starting point of 2001 is distinguishable from a starting point of 2006. So, different outputs, different inputs, excuse me, do lead to different outputs. How does that help you here? It's still, I mean, to the extent that what you say is true, I'm not quite sure how that compels us to find that when there was a change in circumstance found by our court in 2006 to 2013, how that would affect our decision in determining whether or not there was a change in country conditions from 2001 to 2015. Well, I think there's two answers to that. First, the starting point in 2006 is different than that of 2001. That's the premise of the question. I mean, of course it's different in time. But except for a moment that country conditions changed between 2006 and 2013 because that's what Salim said. So if Salim isn't to apply to this case, then it seems to me we either have to start from the premise that country conditions were better or worse in 2001. I don't know which one you're contending, or got better after 15. Is there any evidence in this record of any of that? I think there is evidence that they were worse in 2001. Worse than they were in 2006? Well, that is not, of course, the board couldn't do that comparative analysis. Of course the board couldn't do that. But we know that if you compare 2006 to 2013, country conditions got significantly worse. And so what you're, it seems to me given the benefit of Salim, what we ought to be doing is sending this back to the board and saying, look, unless you think that between 2001 and 2006 something extraordinary occurred, country conditions got better, or whether you think they got better between 2013 and 15, in the absence of that, Salim controls, right? One of the points that counsel made, I think, is In the absence of country conditions having gotten better between 1 and 6 or 13 and 15, Salim controls, yes? I would suggest that the distinction, and there may or may not be one, is that counsel said, and I believe he is right, that every case is different, right? And so what we're talking about is the evidence in the record that was reviewed, and I think your Honor acknowledges that that court may have got it wrong, right? So I think the court there was speaking particular to the evidence in the record between two points in time. So we're talking about different evidence in the record in different points in time. So I don't think it's an automatic, your Honor. It may not be automatic. We may have to send it back to them and say, we've got this case that you didn't know about when you decided this case. It seems to us to be quite instructive and controlling. You didn't have the benefit of it, and we want to send it back to you. And you can look at the record again in light of this case. I'm not sure why that's not the appropriate procedure. I just think it comes back, again, I'm sorry to be redundant, but it comes back to what the regulations say about a change in circumstances. You're really talking about two points. You have individualized risk, right? That is also a point that we haven't discussed yet here. As your friend points out, the country conditions thing is really separate from individualized risk, isn't it? They didn't turn down this motion to reopen because this petitioner didn't show individualized risk. They turned it down because she hadn't demonstrated a change in country conditions. I guess I would respectfully disagree a little bit. I think they both were being analyzed, your Honor. And the individualized risk was notably distinguishable from Saleem because what you have here is no individualized risk. It's not just that the petitioner lived in the United States because that is what happened in Saleem too. But in Saleem, what you had was you had an affidavit from a family member, which you do not have here, and that affidavit from the family member was talking about a particularized threat of violence at the church that the family attends and a failure of intervention by the police. You do not have anything here such as that. In fact, the incidents noted by petitioners, while certainly ones that nobody would want to experience, there is no indication that they are even actually religious acts of discrimination or, more importantly, that they bear any relationship to the petitioner. And that is different than – I'm sorry, your Honor. No, go ahead and finish your sentence. I was just saying that is different than in Saleem where, again, the court was talking about it becoming more particularized, because of what was happening to her sister over there and the threat of violence at the family church. So I think we all can agree that each case is its own case, has its own facts, and it would be wrong to make a blanket conclusion from Saleem that anyone who is a Christian in Indonesia should have their petition granted, right? So doesn't sending it back allow the board or the IJ to take a look and see and allow the parties to introduce whatever additional evidence they might have to either distinguish Saleem or show that Saleem controls? Because right now, as I read Saleem and don't have the record, there's only one real fact that's different, and that was mentioned in the briefing, that Saleem had converted from Buddhism to Christianity. But that really is not a helpful fact one way or the other. That doesn't move the dialogue to the right conclusion. Agreed? Well, I think that was significant because what they were saying is the board failed to – the first prong, as described in the case law, requires a qualitative change. And what the court in Saleem was saying, well, this individual circumstance is entirely changed. It's a different nature of the claim altogether. So, of course, there is a qualitative change, and the board kind of blew that without – But that qualitative change was only the one that put him into his favorite group, right? In other words, he couldn't – the country conditions change wasn't relevant if he had remained a Buddhist. Because the country conditions evidence related to Christians. Right. I would agree with that, yes. And this petitioner was in the disfavored group from the beginning. Right. I would agree with that, yes. I'm sorry, is there – No, I didn't have another question. Okay. But so I just think that we are talking about two considerations, individualized risk along with country conditions. Within the country conditions, you're talking about two different points in time. I do think that there's – if you revisit the particular decision from the board's 2003 decision, they talk about some very bad stuff that is happening to Christians in Indonesia. So that is different. And then when we have no individualized risk, very different from Saleem, we have two things that are different. And so I don't think that a remand is warranted here. Thank you. Thank you, Your Honors. Thank you, Your Honors. I would just like to clarify one point. When we talk about each case being decided on the facts of the case, I was referring more to what would be the case if we were looking at the Prima Fascia claim and if that was the grounds for the denial. I think it's important to keep the two issues separate here. There's a separate grounds of denying a motion to reopen if the petitioner had failed to make a Prima Fascia case for asylum. And I believe there the board probably would have done a much further inquiry into whether or not her evidence of individualized targeting would be sufficient to establish that Prima Fascia claim. The board only addressed the individualized evidence in this case in terms of considering whether or not there was a material change in the country conditions. So there you're looking at the individualized evidence in conjunction with this changed country conditions evidence. And given the drastic increase between 2001 and 2015, I think she submitted more than enough evidence to meet her burden in that regard. The respondents get into sort of issues of whether or not conditions could have changed from 2001 to 2006 such that Selim could be distinguished, but I think as the court has noted, that's not something the board has addressed. That might even be a novel issue of whether or not conditions can change and change back and what effect that would have on an untimely motion to reopen, whether or not there would be sort of a due diligence requirement to file within the first change or the second change. I'm not sure. Well, I take it their argument might be something like conditions really didn't change a bit between 2001 and 2013. It was awful in 2001 and it was awful in 2013. And for some reason, the evidence in Selim indicated that it was better in 2006. Yeah, I'm not sure how that would square that with their original decisions,  the recent sharp decline in attacks, end quote, on Chinese-Indonesians, as well as the immigration judge stating that conditions in Indonesia, quote, certainly the situation had gotten better after May of 1998. It didn't get worse. So part of their decision in the original case was that the petitioner's asylum application was untimely because she didn't file within a reasonable time, within a reasonable period after the May 1998 riots. So they were looking at it and saying, okay, these riots were serious, but conditions have been steadily improving from 1998 to 2001. Therefore, she didn't file her asylum application on time. So to now come back and say somehow they were improving from 1998 to 2001, but they've changed again from 2001 to 2006, it gets very convoluted. And I don't think that's – I'm not sure the board would say that, but that would be something they would have to say in the first instance. But I'm not sure how they could – there would be a lot of changes, basically. They would have to lay out maybe three or four different changes in directions, and they usually don't get that specific. But, again, the board didn't really address any of this. And for our purposes, we're sort of fixed on the two points of 2001 to 2015. Given Saleem, which I do think is controlling, showing a material change in a much shorter period within our period, I think it's clear that a remand would be appropriate. A basis for a remand in Saleem was also the individualized risk, was it not? Yes, and we have submitted evidence of individualized risk, which I believe would satisfy our standard of prima facie. But what's the best evidence of individualized risk that you have? Her letter describing the incidence of harm and targeting of violence to her direct family members, including her brother, with whom it's acknowledged in the record that she would be staying with these family members, so she would be similarly situated to them. Is that individualized risk evidence different than the evidence in Saleem? In other words, did Saleem have a more compelling case of individualized risk? I don't believe so, but I see I'm out of time, and I could brief that further if you'd like, but I'd have to sit down with both cases to specifically go over it. And we can take over the record. Yeah. Saved by the clock. Thank you, Ron. Thank you. Thank you both for your oral argument presentations here today. In the case of Christine Oluyana-Widjaja v. William P. Barr is now submitted.
judges: Murguia, Hurwitz, Zouhary